IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| BCD FARMS, INC., ) | |
| ) | 8:05CV25 |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | **MEMORANDUM AND ORDER** |
| CERTIFIED ANGUS BEEF, LLC, ) | |
| ) | |
| Defendant. ) | |

Before the court are the defendant's motion for summary judgment, Filing No. 72; defendant's motion in limine, Filing No. 93; and plaintiff's motion in limine, Filing No. 96. The court, having carefully considered the record, the extensive briefs and exhibits submitted by the parties, and the relevant case law, now determines that the defendant's motion for summary judgment should be granted.[1]

**Facts**

The plaintiff, BCD Farms ("BCD"), is a Montana corporation engaged in farming and ranching in Scobey, Montana. Filing No. 74, Exhibit ("Ex.") C, Ben Danelson Dep. ("Dep."), 208:11-20. Ben and Connie Danelson operate BCD and are its only shareholders, officers and directors. *Id.* at 9:3-10:1. Both Danelsons have extensive experience in the farming and ranching business. *Id.* at 7:14-15, 8:23-9.2, 9-15:16, 10:5-9; Filing No. 74, Ex. F, Connie Danelson Dep., 8:15-17, 9:13-17. BCD operates a cow-calf business and breeds its cows with purebred Angus bulls. Filing No. 74, Ex. C, Ben Danelson Dep., 28:5-19.

---

[1] Claims against two other defendants, Angus Production, Inc. and Angus Journal, were previously dismissed by this court. Filing No. 31. Additionally, because the court is granting the defendant's motion for summary judgment, Filings No. 93 and 96 are also dismissed as moot.

The defendant, Certified Angus Beef, LLC ("CAB"), is a nonprofit limited liability company with the American Angus Association as its sole member. Filing No. 74, Ex. G, Eichar Declaration, ¶ 2. CAB owns the *Certified Angus Beef*™ trademark and licenses the trademark to others for the sale of *Certified Angus Beef*™ products. *Id.* at ¶ 3. American Angus Association also owns Angus Productions, Inc. which publishes the *Angus Journal*. Filing No. 74, Ex. P, Dep. of Shauna Hermel, 23:7-10.

In the fall of 2001, the Danelsons discussed with Jeff Younkin[2] their thoughts for the disposition of BCD's calves born in the spring of 2001. Filing No. 74, Ex. L, Jeff Younkin Dep., 5:13-15, 8:25-9:5; Ex. M, Younkin Trial Testimony in the U.S. District Court for Nebraska, Case No. 04:02CV3352, August 31, 2004. During the first meeting, Younkin and Ben Danelson discussed three options: selling the calves from the ranch, or feeding them at McGinley-Schilz or Sandhills feedlots. *Id.* at 56:16-57:4.

Younkin showed Ben Danelson Younkin's copy of a January 2001 *Angus Journal* that contained an article entitled "Sorting for Potential" and a copy of a colored pamphlet or brochure from Sandhills Cattle Feeding, Inc. ("Sandhills") feedlot. *Id.* at 57:5-19, 57:20-58:5, 63:13-67:1; Filing No. 74, Ex. EE, January 2001 Article and Ex. SS, Sandhills Brochure. The only time that Ben Danelson saw the January 2001 article prior to sending BCD's calves to Sandhills was during this initial meeting with Younkin, and Connie Danelson did not see the article until after this lawsuit was filed. Filing No. 74, Ex. C, Ben Danelson Dep. 58:6-23 and Ex. F, Connie Danelson Dep. 26:21-27:14. Younkin testified

---

[2] Jeff Younkin was the branch president of Independence Bank in Glasgow, Montana, and the owner and operator of a seedstock business that produces purebred Angus cattle. Younkin and the Danelsons were close friends, with Younkin and Ben Danelson talking to each other almost daily. Filing No. 74, Ex. C, Ben Danelson Dep., 42:7-13. BCD's spring 2001 calves were primarily the offspring of Angus bulls that Younkin had sold to BCD. Filing No. 74, Ex. M, Younkin Trial Testimony, 133:19-134:3.

that he wanted BCD to send its calves to a feedlot licensed Certified Angus Beef because such a feedlot would provide carcass data that would benefit both Younkin's seedstock business as well as the price BCD would receive for the cattle. Filing No. 74, Ex. L, Younkin Dep. 45:18-46:4; Ex. M. Younkin Trial Testimony 134:24-135:6. McGinley-Schilz was not a CAB-licensed facility, so Younkin preferred to have the cattle sent to Sandhills. Filing No. 74, Ex. M, Younkin Trial Testimony, 185:13-23. Additionally, Younkin recommended Sandhills to Ben Danelson because Younkin had sent cattle to Sandhills the previous year and he and other respected Montana ranchers had favorable experiences. Filing No. 74, Ex. L, Younkin Dep. 46:10-49:5.[3]

Ben Danelson later testified that he made the decision to send his cattle to Sandhills based 50% on the recommendation of Younkin and 50% on the Sandhills brochure. Filing No. 74, Ex. D, Ben Danelson Dep. in the Rock County Action, 16:14-17, 13:22-23. Additionally, Ben Danelson testified, "Well, I wanted to go to a different feedlot and [Younkin] felt more comfortable with Sandhills, so they went to Sandhills." *Id.* at 13:8-13. In that same deposition, Danelson testified that Younkin encouraged him to place BCD's calves at Sandhills and that he trusted Younkin's judgment. *Id.* at 13:16-17, 13:22-23.

On November 3 and 5, 2001, BCD shipped a total of 1,432 calves to Sandhills. Filing No. 71, Ex. C, Ben Danelson Dep., 104:14-20. BCD did not have a written contract with Sandhills and retained the option to remove its calves from Sandhills at any time it saw fit. Filing No. 74, Ex. C, Ben Danelson Dep., 94:15-20, 144:17-145:4.

---

[3] Younkin testified that, even without the article, he would have still recommended that BCD ship its calves to Sandhills because it was a CAB-licensed feedlot, his experience there the previous year, and his knowledge of these other Montana producers who had sent or were going to send cattle there. Filing No. 74, Ex. L, Younkin Dep. 49:11-24.

Ben Danelson alleges that the BCD cattle were poorly treated and did not gain weight properly while at Sandhills. *Id.* at 130:8-20. Sandhills contend that the BCD cattle arrived sick with Infectious Bovine Rhinotracheitis ("IBR"). *Id.* at 130:8-131:7. BCD admits that it did not vaccinate the calves for respiratory diseases, including IBR, before sending them to Sandhills. *Id.* at 102:20-23; Ex. L, Younkin Dep. 54:9-24. Younkin flew to Sandhills on December 13, 2001 to check on the cattle and learned that a Sandhills veterinarian diagnosed BCD's cattle with IBR. Filing No. 74, Ex. ZZ, Ben Danelson Trial Testimony 106:2-5, 331:12-14; Ex. RR, Ben Danelson 9/2/06 Affidavit ¶ 9.[4]

On December 29, 2001, Younkin received a call from another seedstock producer who told Younkin that there was a problem at Sandhills and recommended that BCD remove its calves. Filing No. 74, Ex. L, Younkin Dep. 61:25-62:3; Ex. M, Younkin D. Neb. Tr. 151:11-20, 187:12-188:12. On December 30, 2001, Younkin traveled to Sandhills and removed the cattle to Ainsworth Feed Yards in Ainsworth, Nebraska. Filing No. 74, Ex. C, Ben Danelson Dep. 30:10-21. Approximately 385 BCD cattle died while at Sandhills. Filing No. 83, Ex. 13, Sandhills Answers to Requests for Production of Documents.

BCD alleges it sent its cattle to Sandhills based on fraudulent representations made by CAB in the January 2001 edition of *Angus Journal* about Sandhills and its facilities. See Amended Complaint at ¶¶ 6-10. A representative of CAB, John Stika ("Sitka"), was quoted in the article as stating:

---

[4] The Bankruptcy Court for the District of Nebraska issued a memorandum of findings of fact and conclusions of law related to BCD's objections to the confirmation of Sandhills Amended Chapter 12 Plan. Filing No. 74, Ex. QQQ, Memorandum in case no. BK05-40061. In that memorandum, the bankruptcy court made a specific finding that the 385 head of cattle that were lost at Sandhills died as the result of IBR. *Id.* at p. 4.

4

> As far as facilities, Carlson has some of the best I've seen for calves. He's got room for 6,500 head, but never packs it so full that he can't sort cattle to another pen for better results. . . . He targets CAB® with every pen and gets phenomenal results – really consistent closeouts.

Filing No. 74, Ex. EE, January 2001 *Angus Journal* Article.

BCD alleges that CAB made these statements notwithstanding its knowledge that Sandhills had been failing to comply with its licensing guidelines. *Id.* According to BCD, CAB made these statements public in the Angus Journal, despite its knowledge that, from July 1999 until February 1, 2002, Sandhills had failed to comply with the licensing requirements of "timely submission of paperwork and fees associated with cattle enrollments, carcass and performance data, ear tags . . . etc." *Id.* BCD specifically states that, in terminating Sandhills' license, CAB wrote to Sandhills on February 1, 2002, stating:

> Since licensing in July 1999, the inability of Sandhills Cattle Feeding, Inc. to operate within the guidelines of the Feedlot Licensing Program and respond to essential issues in a timely manner has created a level of concern that compromises the ability of our two organizations to work together effectively. . . . As a result, Certified Angus Beef LLC is exercising its right to terminate the licensing agreement with Sandhills Cattle Feeding, Inc.

*Id.*; Ex. B. BCD alleges that it incurred damages in excess of $500,000 as the result of its reliance on CAB's fraudulent misrepresentations.

**Standard of Review**

On a motion for summary judgment, the question before the court is whether the record, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1326 (8th Cir. 1995). Where unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate. *Id.*

5

The burden of establishing the nonexistence of any genuine issue of material fact is on the moving party. Fed. R. Civ. P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Therefore, if the defendant does not meet its initial burden with respect to an issue, summary judgment must be denied notwithstanding the absence of opposing affidavits or other evidence. *Adickes*, 398 U.S. at 159-60; *Cambee's Furniture, Inc. v. Doughboy Recreational Inc.*, 825 F.2d 167, 173 (8th Cir. 1987).

Once the defendant meets its initial burden of showing there is no genuine issue of material fact, the plaintiff may not rest upon the allegations of his or her pleadings but rather must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. *See* Fed. R. Civ. P. 56(e); *Chism v. W.R. Grace & Co.*, 158 F.3d 988, 990 (8th Cir. 1998). The party opposing the motion must do more than simply show that there is some metaphysical doubt as to the material facts; he or she must show "there is sufficient evidence to support a jury verdict" in his or her favor. *Id.* Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Although facts are viewed in the light most favorable to the nonmoving party, "in order to defeat a motion for summary judgment, the nonmoving party cannot simply create a factual dispute; rather, there must be a genuine dispute over those facts that could actually affect the outcome of the lawsuit." *Carter v. St. Louis University,* 167 F.3d 398, 401 (8th Cir. 1999); *Ghane v. West,* 148 F.3d 979, 981 (8th Cir. 1998). In ruling on a motion for summary judgment, a

court must not weigh evidence or make credibility determinations. *Kenney v. Swift Transp. Co.*, 347 F.3d 1041, 1044 (8th Cir. 2003).

**Choice of Law**

Where jurisdiction is based on diversity of citizenship, a federal district court applies the same conflicts of laws analysis as the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). When conflicts of laws issues arise, Nebraska follows the Restatement (Second) of Conflict of Laws. *Inacom Corp. v. Sears, Roebuck & Co.*, 254 F.3d 683, 687 (8th Cir. 2001) (citing *Harper v. Silva*, 399 N.W.2d 826, 828 (Neb. 1987)); *Grassmueck v. American Shorthorn Ass'n*, 365 F. Supp. 2d 1042, 1049 (D. Neb. 2005).

Under Restatement (Second) of Conflict of Laws § 147, the local law of the state where the injury occurred is applied in cases of injury to tangible things, including personalty, unless another state has the most significant relationship under the principles stated in § 6 to the occurrence, the thing, and the parties.[5] The principles contained in § 6 are: "(1) the needs of the interstate and international systems, (2) the relevant policies of

---

[5] The Restatement (Second) of Conflict of Laws § 145 (1971) sets forth the "'most significant relationship'" test used for determining the applicable law for specific tort claim issues. *See Malena v. Marriott Intern., Inc.*, 651 N.W.2d 850, 856 (Neb. 2002). Section 145 states:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

    (a)    the place where the injury occurred,
    (b)    the place where the conduct causing the injury occurred,
    (c)    the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and
    (d)    the place where the relationship, if any, between the parties is centered.

*Heinze v. Heinze*, 742 N.W.2d 465, 460 (Neb. 2007).

the forum, (3) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (4) the protection of justified expectations, (5) the basic policies underlying the particular field of law, (6) certainty, predictability and uniformity of result, and (7) ease in the determination and application of the law to be applied." Restatement (Second) of Conflicts of Law § 6.

Under §147, the alleged injury in this case, *i.e.*, the death of the cattle, occurred in Nebraska. The court finds that Montana does not have the most significant relationship, given Nebraska's dominant interest in actions related to the injury of chattel located within its state. Therefore, the court finds that Nebraska law should apply to this matter.[6]

**Fraudulent Misrepresentation**

To maintain an action for fraudulent misrepresentation, a plaintiff must allege and prove that: (1) a representation was made; (2) the representation was false; (3) when made, the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) it was made with the intention that the plaintiff should rely upon it; (5) the plaintiff reasonably did so rely; and (6) that the plaintiff suffered damage as a result. *Precision Enterprises, Inc. v. Duffack Enterprises, Inc.,* 710 N.W.2d 348, 354 (Neb. 2006); *Nebraska Nutrients, Inc. v. Shepherd,* 626 N.W.2d 472, 495 (Neb.

---

[6] The court notes that under Montana law the result would be the same. Under Montana law, the elements for proving fraudulent misrepresentation are: (1) a representation; (2) the falsity of that representation; (3) the materiality of the representation; (4) knowledge of the representation's falsity or ignorance of its truth; (5) intent that the representation should be acted upon by the person and in the manner reasonably contemplated; (6) ignorance of the representation's falsity; (7) reliance upon the truth of the representation; (8) the right to rely upon the representation; and (9) consequent and proximate injury or damages caused by its reliance on the representation. *In re Estate of Kindsfather*, 108 P.3d 487, 490 (Mont. 2005). Because the court finds that no false representations were knowingly made and that any statement that was made was not reasonably relied upon by BCD, summary judgment would also be granted if Montana law is applied.

2001). Whether a party's reliance upon a misrepresentation was reasonable is a question of fact. *Nebraska Nutrients*, 626 N.W.2d at 495-96. While direct evidence in a fraud case is not essential, proof of fraud drawn from circumstantial evidence must not be guesswork or conjecture; such proof must be rational and logical deductions from the facts and circumstances from which they are inferred. *Id.*

To support a claim of fraud, the representation alleged to be fraudulent must be "an assertion of fact, not merely an expression of opinion." *Ed Miller & Sons, Inc. v. Earl*, 502 N.W.2d 444, 453 (Neb. 1993). The Restatement (Second) of Torts § 538A provides further guidance on when a statement is merely an opinion. That section states a "representation is one of opinion if it expresses only . . . [the speaker's] judgment as to quality, value, authenticity, or other matters of judgment." Restatement (Second) of Torts § 538A (1977). The maker of a statement of this nature will normally be understood as expressing only his own judgment. *Id.* at cmt. b.

In *Ed Miller*, the Nebraska Supreme Court held that the term "first class condition" to be an expression of opinion and mere puffing. *Ed Miller*, 502 N.W.2d at 453, *citing Baldwin v. Priem's Pride Motel, Inc.,* 224 Kan. 432, 580 P.2d 1326 (1978) (statement that house would be in first-class condition was puffing); *Strother Ford, Inc. v. Bullock*, 142 Ga.App. 843, 237 S.E.2d 208 (1977) (statement that car was in A-1 condition was puffing); *Randall v. Smith*, 136 Ga.App. 823, 222 S.E.2d 664 (1975) (statement that car was in good

condition and suitable for driving was puffing).[7]  Similarly, the statements in this case cannot be deemed to be more than statements of opinion.

Even if this court were to determine that the statements by Sitka were representations, not merely his opinion, summary judgment would still be proper as the evidence presented in this matter shows that the statements were true.  The evidence presented indicates that Sitka reviewed Sandhills' carcass data as of the date of his interview. Filing 83, Ex. 7, Stika Dep. 44:4-45:9. That carcass data included various statistical, quantifiable information about the carcasses of animals after they had been harvested (killed). See Filing No. 74, Ex. VVV, Eichar Reply Declaration ¶ 4.   The plaintiffs have not provided any argument that there wasn't room for 6,500 head of cattle or that, in 2000, Carlson was packing the pens.  Sitka testified at his deposition that he visited Sandhills twice.  Filing No. 74, Ex. Q, Sitka Dep. 16:12-20:12; 24:4-6; 26:25-27:8; 28:5-13.  Sitka's opinion was that the feedlot was well protected from weather by shelterbelts of trees on both the north and south, the soil was sandy, the pens were relatively small for the industry, and the pens were in good repair.  *Id.* at 16:21-18:1.

As of August 29, 2000, 35.6% of the cattle that Sandhills had enrolled in the Feedlot Harvest Summary Report were *Certified Angus Beef*™ compared to a national average of

---

[7] Judge Learned Hand stated concerning sales talk or puffing:

> There are some kinds of talk which no sensible man takes seriously, and if he does he suffers from his credulity. If we were all scrupulously honest, it would not be so; but, as it is, neither party usually believes what the seller says about his own opinions, and each knows it. Such statements, like the claims of campaign managers before election, are rather designed to allay the suspicion which would attend their absence than to be understood as having any relation to objective truth.

*Id. citing Vulcan Metals Co. v. Simmons Mfg. Co.*, 248 F. 853, 856 (2d Cir.1918), cert. denied 247 U.S. 507, 38 S.Ct. 427, 62 L.Ed. 1241.  While, the statements at issue were made by CAB, they were made regarding a CAB licensed facility which should have put BCD on notice that Sitka's statements were sales talk.

18.3% and was higher than 88% of the pens of cattle harvested nationwide in the Feedlot Licensing Program. Filing No. 74, Ex. MM, Feedlot Harvest Summary Reports and Ex. NN, CAB Acceptance Report. Similarly, in January 2001, when the article was published, Sandhills had a *Certified Angus Beef*™ acceptance rate of 34.5% compared to a national average of 18.3%, 87% higher than other pens of cattle during a comparable period of time. Filing No. 74, Ex. MM, Feedlot Harvest Summary Reports and Ex. NN, CAB Acceptance Report.

BCD argues that CAB had concerns and problems with Sandhills since it was first licensed in 1999. BCD argues that Sandhills was not properly enrolling cattle and thus the data relied upon by Sitka was erroneous.[8] CAB employees testified at depositions that Sandhills had a problem with timely submitting its enrollment data and was behind on paying for its ear tags. Filing No. 83, Ex. 3, Turk Stovall Dep. 26:7-15; 32:14-22. Additionally, Sitka testified that as of the termination date, CAB was also having a problem with Sandhills not timely filing carcass data. Filing No. 83, Ex. 7, Sitka Dep. 34:-13-35:23. However, the data reviewed by Sitka was carcass data and BCD presents only unsubstantiated allegations that the carcass data was not reliable during the relevant time period. The evidence in this case provides that at most, CAB's problems with getting carcass data from Sandhills developed in the late summer and early fall of 2001, roughly a year after Sitka made the statements. Moreover, even if this court accepts as true all the

---

[8] BCD Farms uses enrollment data and carcass data interchangibly; however, the terms each reference different indicators. The enrollment dates indicate when the cattle are enrolled in the Feedlot Licensing Program; carcass data is based on data that CAB collected when the cattle were later harvested (killed) at a packing plant. Ex. VVV, Eichar Reply Declaration ¶ 4. The statements made by Sitka regarding Sandhills' ability to feed and manage cattle so as to achieve Certified Angus Beef™ acceptance rates that were among the best in the Feedlot Licensing Program was demonstrated by the carcass data.

problems between CAB and Sandhills as alleged by BCD, none of these problems render the statements in the article false. Sitka testified at his deposition that his statements regarding the quality of Sandhills facilities were based on his observations of the facilities while visiting Sandhills. This has not been controverted by BCD. Additionally, Sitka's statements regarding "phenomenal results" and "closeout numbers" are supported by CAB's records and, therefore, BCD has no evidence that the statements were false.

Taking the analysis one step further, the court finds that there is no genuine issue of material fact that BCD's alleged reliance on the statements was unreasonable. Whether a party's reliance upon a misrepresentation was reasonable is a question of fact. *Precision Enterprises, Inc., v. Duffack Enterprises, Inc.*, 710 N.W.2d 348, 520 (Neb. 2006); *citing Cao v. Nguyen*, 607 N.W.2d 528 (Neb. 200). A party is justified in relying upon a representation made to the party as a positive statement of fact when an investigation would be required to ascertain its falsity. *Id.* Nebraska law imposes a duty of ordinary prudence upon a party claiming fraudulent misrepresentation. *Schuelke v. Wilson*, 250 Neb. 334, 549 N.W.2d 176 (1996). In regard to this duty, the Nebraska Supreme Court has stated: " '[W]hile no action will lie where ordinary prudence would have prevented the deception, that rule is generally applied where the means of discovering the truth was in the hands of the party defrauded.'" *Id.* at 182.

Ben and Connie Danelson are experienced farmers and ranchers, and sent over 1,400 head of cattle to Sandhills without conducting any due diligence into the feedlot. Neither the Danelsons nor BCD had a prior relationship with CAB or Sitka. The Danelsons saw the *Angus Journal* only because Younkin provided a copy to Ben Danelson to look at when Ben Danelson was at Independence Bank's offices in Montana. Danelson didn't take

a copy of the magazine with him to read or investigate the information contained in the article more throughly.  The Danelsons took no steps to determine the truth of the statements in the article.  The Danelsons conducted no independent research of Sandhills and never visited the facilities before shipping BCD's cattle there or even after they heard of problems at the feedlot.  They never requested enrollment data or carcass data from Sandhills or CAB.  Therefore, this court finds as a matter of law that BCD cannot be said to have reasonably relied on CAB's statements in the *Angus Journal* article.

Because this court has determined that the statements made by Sitka were not false representations and, even if they were false representations, they were not reasonably relied upon, and those findings are dispositive, the court finds it unnecessary to review the remaining elements of fraudulent misrepresentation.

THEREFORE, IT IS ORDERED that defendant's motion for summary judgment, Filing No. 72, is granted and this case is dismissed with prejudice.  Additionally, Filings No. 93 and 96 are dismissed as moot.

DATED this 11th day of February, 2008.

BY THE COURT:


s/ Joseph F. Bataillon
Chief United States District Judge